UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Civil Action No.

ELLEN LARSON, individually and on behalf of all others similarly situated,

    Plaintiff,

  v.

THE ALIERA COMPANIES, INC., a Delaware corporation;
ALIERA HEALTHCARE, INC., a Delaware corporation; and
TRINITY HEALTHSHARE, INC., a Delaware corporation,

    Defendants.

---

## CLASS ACTION COMPLAINT

---

### I.  PARTIES

1.      Plaintiff ELLEN LARSON is a citizen of Colorado who resides in Colorado Springs.  Ms. Larson was enrolled in a health care plan from Defendants Aliera Healthcare and/or Trinity Healthshare from July through December, 2018.

2.      Defendant ALIERA HEALTHCARE, INC. is a Delaware corporation headquartered in Atlanta, Georgia.  It is incorporated as a for-profit business, without any express religious affiliation.

3.      Defendant THE ALIERA COMPANIES, INC. is a Delaware corporation headquartered in Atlanta, Georgia. It is incorporated as a for-profit entity without any express religious affiliation. Based on information and belief, it either changed its name from ALIERA HEALTHCARE, INC., or is the parent corporation of Aliera Healthcare, Inc.  Collectively, defendants The Aliera Companies, Inc. and Aliera Healthcare, Inc. are referred to as "Aliera."

4.     Defendant TRINITY HEALTHSHARE, INC. ("Trinity") is a Delaware corporation headquartered in Atlanta, Georgia and purports to be a nonprofit entity. Trinity was incorporated on or about June 27, 2018.  Aliera and Trinity are collectively referred to as "Defendants."

5.     Aliera markets, sells, and administers insurance plans for Trinity and is solely responsible for the development of plan designs, pricing, marketing materials, vendor management, recruitment and maintenance of a sales force on behalf of Trinity.

6.     Neither Aliera nor Trinity hold a certificate of authority from the Colorado Division of Insurance as required by § 10-3-105 C.R.S., and neither are authorized or licensed to provide any type of insurance plan in Colorado.

## II.  JURISDICTION AND VENUE

7.     Jurisdiction of this Court arises pursuant to 28 U.S.C. § 1332(a) and § 1367 because there is diversity of citizenship and the amount in controversy related to the proposed class claims exceeds $75,000.

8.     Venue is proper because some of the acts or omissions occurred in the District of Colorado, and the named Plaintiff and many of the proposed class members reside in Colorado.

## III.  NATURE OF THE CARE

9.     When Congress passed the Patient Protection and Affordable Care Act ("ACA") in 2010, it required all individuals to be covered by health insurance or pay a penalty.  Congress allowed for a handful of exceptions to that requirement, set out in 26 U.S.C. § 5000A.  One of those exceptions was for members of existing Health Care Sharing Ministries ("HSCMs").  In order to qualify as an HSCM under the ACA, an entity must meet rigid requirements, including: (1) it must be recognized as a 501(c)(3) tax exempt organization; (2) its members must "share a common set of ethical or

religious beliefs and share medical expenses among members according to those beliefs;" and (3) it must have "been in existence at all times since December 31, 1999, and medical expenses of its members [must] have been shared continuously and without interruption since at least December 31, 1999." 26 U.S.C. § 5000A(d)(2)(B)(ii).

10.     Defendants, in an attempt to exploit this exception, falsely represented that Trinity has been "recognized" as an HCSM.  Trinity did not meet the requirements of 26 U.S.C. § 5000A(d)(2)(B)(ii) because it was not in existence until 2018, and because it did not require its members to adhere to its stated ethical or religious beliefs. It was never, and could not have been, "recognized" as an HCSM because the federal agency that had at one time provided letters of recognition stopped doing so in 2016, before Trinity was created.

11.     While falsely representing that Trinity is a recognized HCSM, Defendants issued illegal and unauthorized health insurance products to citizens of the State of Colorado.  They sold illegal insurance plans to hundreds, if not thousands, of Colorado residents.  These plans did not comply with the minimum basic requirements for authorized health care plans under state or federal law, and have resulted in Colorado residents (1) paying for an illegal contract, and (2) being denied coverage for medical care required by law to be provided.  Aliera and its owners, however, have realized exorbitant profits, by taking over 83% of all payments made by individuals, while refusing to pay claims.

12.     Aliera, using Trinity as a purported HCSM, created, marketed, sold, and administered plans in Colorado. These plans qualify as health insurance under Colorado law, §10-1-102(6)(a) C.R.S. and are unauthorized under §10-3-105 C.R.S. The unauthorized insurance plans created, marketed, sold, and administered by Defendants

did not meet the minimum benefits, coverage and other requirements for health insurance in Colorado.  They are illegal contracts.

13.     Defendants' representations that the insurance plans were HCSM plans were misleading, unfair and/or deceptive in violation of the Colorado Consumer Protection Act.  At no relevant time did the Defendants' plans meet the requirements for HCSMs under federal law as represented.

14.     Plaintiff, on behalf of the class she seeks to represent, filed this lawsuit to obtain declaratory and injunctive relief to prevent Defendants from continuing to create, market, sell, and administer unauthorized and illegal health insurance plans in Colorado.  On behalf of the proposed class and on her own behalf, Plaintiff also seeks damages related to uncovered health care expenses, premiums paid and other losses due to Defendants' creation, marketing, sale, and administration of unauthorized and illegal health insurance plans.

15.     Specifically, Defendants created, marketed, sold, and administered plans that provided certain payment benefits in the event of specified health-related contingencies in exchange for a monthly payment.  The amount of benefits was tied to the amount of the monthly premium payment and the cost incurred by the customer for health-related medical treatments.  Under Colorado law, the arrangement fits squarely within the definition of "insurance" and may not be marketed, sold or administered without meeting minimum requirements and obtaining authorization from the Colorado Department of Insurance.

## IV.  CLASS ALLEGATIONS

16.     ***Definition of Class:***  Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this action on behalf of herself and all persons similarly situated.  The proposed Class is defined as follows:

> All Colorado residents who purchased a plan from any of Defendants or their subsidiaries that purported to be "health care sharing ministry" plan at any time since June 29, 2018.

17.    *Size of the Class:*  The Plaintiffs' proposed class is so numerous that joinder of all members is impracticable.  Hundreds, if not thousands, of individuals in Colorado are covered by Defendants' plans.

18.    *Common Questions of Fact and Law:*  There are questions of law and fact that are common to all class members including:  (1) whether the healthcare products that the Defendants created, marketed, sold, and administered to class members met the legal requirements of an HCSM under 26 U.S.C. § 5000A; (2) whether plans sold were "insurance" under Colorado insurance law; (3) whether Colorado insurance law and regulations forbid the creation, marketing, sale, and administration of health care products in the "business of insurance" without authorization or other legal exception; (4) whether Defendants failed to obtain proper authorization for the creation, marketing, sale, and administration of an insurance product in Colorado; (5) whether class members are entitled to (a) rescission of the plan(s) and refunds of all premiums paid and/or (b) reformation of the plans to comply with the minimum insurance coverage requirements of Colorado and federal law, and re-processing of all claims for expenses and costs incurred that would have been covered had the plan(s) properly complied with those laws; (6) whether Defendants' actions were "unfair" and/or "deceptive" under the Colorado Consumer Protection Act ("CCPA"); and (7) whether class members are entitled to other damages, including statutory treble damages, resulting from Defendants' unfair and/or deceptive acts.

19.    *Class Representative:*  The claims of the named Plaintiff are typical of the claims of the proposed class as a whole resulting from Defendants' sale of unauthorized and illegal insurance plans.  The named Plaintiff will fairly represent and adequately

protect the interests of the class members because she has been subjected to the same practices as other class members and suffered similar injuries.  The named Plaintiff does not have interests antagonistic to those of other class members as to the issues in this lawsuit.

20.     ***Separate Suits Would Create Risk of Varying Conduct Requirements***.  The prosecution of separate actions by class members against Aliera and/or Trinity would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct.  Certification is therefore proper under Fed. R. Civ. P. 23(b)(1).

21.     ***Defendants Have Acted on Grounds Generally Applicable to the Class.*** Defendants Aliera and Trinity have uniformly created, marketed, sold and administered unauthorized health insurance plans in Colorado.  They have misrepresented the plans as HCSM plans under federal law.  Defendants have acted on grounds generally applicable to the proposed class, rendering declaratory and injunctive relief appropriate respecting the whole class.  Certification is therefore proper under Fed. R. Civ. P. 23(b)(2).

22.     ***Questions of Law and Fact Common to the Class Predominate Over Individual Issues.***  The claims of the individual class members are more efficiently adjudicated on a class-wide basis.  Any interest that individual members of the class may have in individually controlling the prosecution of separate actions is outweighed by the efficiency of the class action mechanism.  Upon information and belief, no class action suit is presently filed or pending against Aliera and/or Trinity for the relief requested in this action.  Issues as to Aliera's and/or Trinity's conduct in applying standard marketing, sales and administration practices towards all members of the class

predominate over questions, if any, unique to members of the class.  Certification is therefore additionally proper under Fed. R. Civ. P. 23(b)(3).

23.     *Venue*.  This action can be most efficiently prosecuted as a class action in this jurisdiction, where Defendants do business and where Plaintiff resides.

24.     *Class Counsel*.  Named Plaintiff has retained experienced and competent class counsel.

## V.  FACTUAL BACKGROUND

### *Aliera Seeks Out an HCSM to Avoid Insurance Requirements, But Its First Relationship Ends in Litigation*

25.     Defendant Aliera Healthcare, Inc. was incorporated in the State of Delaware by Timothy Moses, a convicted felon, his wife Shelley Steele, and their son Chase Moses, in December 2015.  Before forming Aliera, Timothy Moses was the president and CEO of International BioChemical Industries, Inc., a company that declared bankruptcy in 2004 after he was charged with felony securities fraud and perjury.  As a result of the case, titled *United States v. Moses*, 1:04-cr-00508-CAP-JMF (N.D. Ga.), Moses was sentenced to over 6 years in prison, and ordered to pay $1.65 million in restitution.

26.     Aliera is a for-profit entity.  Its stated scope of business is "to engage in the business of providing all models of Health Care to the general public" and "to cultivate, generate or otherwise engage in the development of ideas or other businesses. To buy, own or acquire other businesses, to market and in any way improve the commercial application to the betterment and pecuniary gain of the corporation and its stockholders..."  The formation documents of Aliera Healthcare, Inc. do not include any discussion of religious or ethical purposes or missions.

27.     Non-party Anabaptist Healthshare ("Anabaptist") was a small Mennonite entity located in Virginia.  Anabaptist had been recognized by the federal Department of Health & Human Services' Centers for Medicare & Medicaid Services ("CMS") as an HCSM.  CMS had provided a letter to Anabaptist that it met the requirements under 26 U.S.C. § 5000A to operate an HCSM.  Specifically, CMS found that Anabaptist had been "in existence at all times since December 31, 1999 and medical expenses of its members have been shared continuously and without interruption since December 31, 1999."

28.     Upon his release from prison, and after forming Aliera, Timothy Moses convinced Anabaptist to permit Aliera to market HCSMs using Anabaptist's designation. Anabaptist created a wholly-owned subsidiary, called Unity Healthshare ("Unity"), for that purpose.   Under the proposal, Aliera would market the plans in exchange for a $25 per member per month fee for its administrative services.

29.     Aliera entered into a contract with Unity on or about February 1, 2017. Under that contract, Aliera would offer health products to the public that did not meet the insurance benefits and coverages required by the Affordable Care Act through its HCSM exemption in 26 U.S.C. § 5000A.  In return, Aliera's customers would join the Unity HCSM, increasing members to Anabaptist's HCSM.

30.     Under the contract with Unity, Aliera was responsible for maintaining and segregating the assets received that were reserved for payment of benefits to Unity members.

31.     In 2018, after thousands of Aliera/Unity plans had been sold nationwide, Anabaptist/Unity discovered that Mr. Moses had written himself approximately $150,000 worth of checks from Unity funds without board approval and had not properly maintained assets reserved for payment of benefits.  It requested an accounting and, in July 2018, demanded Aliera turn over control of all Unity funds.

32.     Unity terminated the relationship with Aliera in summer, 2018.   A lawsuit between Aliera and Anabaptist Health Share/Unity was filed in Superior Court of Fulton County Georgia in late 2018.   *See Aliera Healthcare v. Anabaptist Health Share et al.*, No. 2018-cv-308981 (Hon. Alice D. Bonner, Ga. Sup. Ct.).   As a result of the lawsuit, a court-ordered receiver now monitors Aliera's administration of HCSM assets and benefits for Unity members.   *See **Appendix A***, Order Entering Interlocutory Injunction and Appointing Receiver dated April 25, 2019.

### *Aliera Created Trinity as a Sham Health Care Sharing Ministry to Avoid ACA Requirements*

33.     With its relationship with Unity terminating, Aliera would have no affiliation with any HCSM.  Trinity was therefore created by Aliera and its principals on June 27, 2018 as a purported nonprofit entity.  William Rip Theede, III was the CEO of Trinity.  Mr. Theede is a former Aliera employee.  He is also a close family friend of the Moses family and officiated at Chase Moses' wedding.

34.     Trinity had no predecessor entity.

35.     Trinity had no members when it was formed.

36.     Trinity could not qualify as an HCSM because it was created after December 31, 1999, and at the time of its creation, had no members.  In order to qualify as an HCSM under federal law, the entity or a predecessor of the entity must, among other requirements, have "been in existence at all times since December 31, 1999, and medical expenses of its members [must] have been shared continuously and without interruption since at least December 31, 1999." 26 U.S.C. § 5000A(d)(2)(B)(IV).  Trinity has not had members who have shared medical expenses "continuously and without interruptions since at least December 31, 1999."

37.     In addition, in order to qualify as an HCSM under federal law, the members of the entity must "share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs. . . ." 26 U.S.C. § 5000A(d)(2)(B)(III).  Although Trinity's bylaws set forth a specific set of religious beliefs, it has never restricted its membership to those individuals who affirm the specific common beliefs.

38.     Trinity's bylaws (1) set forth a Protestant understanding of the Bible as the "final and only source of absolute spiritual authority," (2) affirm God is "triune," or a trinity, (3) set forth an orthodox view of Jesus Christ as fully God and fully man, (4) affirm Jesus Christ as sinless, and the result of a virgin birth, (5) affirm that people can only be saved "by grace alone, through faith alone," and (6) affirm the literal resurrection of Jesus Christ.

39.     Nevertheless, Trinity does not require members to affirm agreement to any of these sectarian principles, and does not exclude members from faiths that do not adhere to these beliefs.  Members are only asked to generically affirm a "Statement of Beliefs" that "personal rights and liberties originate from God," "every individual has a fundamental right to worship God in his or her own way," there is a moral obligation "to assist our fellow man when they are in need," there is a duty to "maintain a healthy lifestyle," and a fundamental right of conscience to direct one's own healthcare exists. See *Appendix B,* p. 21.  As stated in "frequently asked questions" on Defendants'' website, "Trinity HealthShare welcomes members of all faiths who can honor the Statement of Beliefs, by which the Trinity HealthShare program operates."  *Appendix C, p. 11.*

40.     While prospective agents must take a training assessment, the questions asked in the assessment do not address any religious or ethical motivation.  Defendants'

advertisements for prospective agents, and the training materials for agents do not mention a religious or ethical component for purchasers of these plans.

41.    In a video posted to YouTube dated November 1, 2018, an unidentified Aliera trainer for new or prospective agents discussed the Aliera Healthcare Enrollment Process.  According to the video, in order to enroll in Aliera, the consumer must positively respond to a number of questions.  The first question asks if the consumer agrees with Trinity's "statement of faith:"

> **At the core of what the Healthcare Sharing Ministry does, and how they relate to and engage with one another as a community of people is a set of common beliefs**.
>
> 1. We believe that our personal rights and liberties originate from God and are bestowed on us by God.  2. We believe that every individual has a fundamental religious right to workshop God in his or her own way.  3. We believe it is our moral and ethical obligation to assist our fellow man when they are in need according to our available resources and opportunity.  4. We believe it is out spiritual duty to God and our ethical duty to others to maintain a healthy lifestyle and avoid foods, behaviors or habits that produce sickness or disease to ourselves or others.  5. We believe it is our fundamental right of conscience to direct our own healthcare, in consultation with physicians, family or other valued advisors.
>
> o   Yes
>
> o   No

42.    The training explains what the "statement of faith" means:

> Just to give you a general overall synopsis of what it's saying … It basically is saying that you believe in a higher power. It doesn't necessarily have to be a Christian God, or a Buddhist God, or a Jewish God. It doesn't … matter as long as we all believe that there is a higher power and we're all living our life that the best way that we possibly can. We're maintaining

a healthy lifestyle. We're trying to avoid those types of foods, behaviors, habits - things that, you know, cause us illness that are in our control.

As long as we're doing those types of things, we're all like-minded individuals. So if you feel that way, and you are a like-minded individual, that's all we're trying to find out. And, if you are, you're gonna say, "Yes," you believe in the five same statement of beliefs that we all do.

43.     Defendants represent that Trinity is "recognized" as a qualified HCSM. *See* **Appendix D**.  It was, in fact, impossible for Trinity to be "recognized" as such because the rule that provided such recognition was eliminated years before Trinity was even created.  In 2013, the United States Department of Health and Human Services ("HHS") promulgated a rule under which it certified HCSMs by issuing a certificate of exemption to the entity.  However, the rule was eliminated in 2016. *See* 81 Fed. Reg. 12281 (final rule eliminates the issuance of exemptions for HCSMs).  Trinity has never appeared on any list of recognized HCSMs developed by HHS.

44.     Likewise, the Internal Revenue Service ("IRS") does not and has never recognized any entities as HCSMs.  Its role is limited to accepting tax returns from individuals who may claim that they are entitled to an HCSM exemption on their individual tax returns.  The IRS has never recognized Defendants as a qualified HCSM under 26 U.S.C. § 5000A(d)(2)(B).  Defendants' representations to the contrary are false and misleading.

45.     On or about August 13, 2018, Aliera signed an agreement with Trinity to provide the marketing, sale and administration of the purported HCSM plans. The contract allowed Aliera to use Trinity's non-profit status to sell health care plans purporting to be HCSM plans, while keeping complete control of the money, the administration of the plans, and the membership roster.

***The Products Defendants Create, Market, Sell,***
***and Administer are Health Insurance***

46.     During certain times on and after June 27, 2018, when Defendant Trinity was incorporated, Plaintiff and members of the class have been, are, or will be enrolled in healthcare insurance products created, marketed, sold, and administered by Defendants that Defendants claimed were HCSM plans.

47.     The healthcare products marketed, sold, and administered charge "members" a "monthly contribution" to participate.  Defendants described the "contributions" members pay as "premiums."  *See e.g.,* ***Appendix C****,* pp. 3-4**.**

48.     The amount of the premium charged is based on the medical program selected by the insured.  The programs include "interim medical," "comprehensive," "standard," "basic care," and "catastrophic." *Id.,* p. 1.  The programs require a member to pay a deductible, which Defendants call a "Member Shared Responsibility Amount." *Id.,* p. 4.  Once this amount has been paid, then medical bills are paid in accordance with a benefits booklet or member guide for the selected program.  These benefit booklets contain the "membership instructions" which detail the "eligible medical expenses," "limits of sharing," limitations on pre-existing conditions, and exclusions.  The programs require pre-authorization of certain non-emergency surgeries, procedures or tests, as well as for certain types of cancer treatments.  *See e.g.,* ***Appendix B****,* p. 29.

49.     The programs are offered at least three benefit levels.  The programs at the higher levels charge more and therefore provide more robust benefits for covered medical conditions.  ***Appendix C****,* p.1

50.     The programs provide coverage for medical expenses.  Among other things, the programs provide coverage for preventive care, primary care, urgent care, labs and diagnostics, x-rays, prescription benefits, specialty care, surgery, and

emergency room services.  *Appendix B*, pp. 22-25*.*    The programs, for an additional premium, will also provide maternity care.  *Appendix C, p. 7.*

51.    The programs have established preferred provider networks ("PPOs") through which members can seek care.  Payments are made by Defendants directly to providers.

52.    The programs contain exclusions and lifetime limits, including a lower lifetime limit for cancer treatment.

53.    Payments are made to health care providers on behalf of members who are current on their monthly premiums in the event they experience a covered loss, have met their deductible or "Member Shared Responsibility Amount," and otherwise meet the coverage requirements set forth in the coverage booklet.  These payments are expressly contingent upon the occurrence of a covered medical need by the participating member.

54.    Payment from the program upon the occurrence of a covered loss is not voluntary.  Under the terms of the program, as set forth in the Member Guide, Trinity is instructed and required to "share clearing house funds in accordance with the membership instructions."  *Appendix B*, p. 21 (Contributors' Instructions and Conditions). The "membership instructions" is nothing more than a booklet of benefits created by Defendants.  The members have no role in the creation of the benefits booklet. Members do not decide who gets paid benefits. Instead, according to the Member Guide, the members must accept Trinity's adjudication of benefits: "By participation in the membership, the member accepts these conditions."  According to the benefits booklet, Trinity, and not the members, is the "final authority for the interpretation" of the membership instructions, and Trinity directs payment to

providers on behalf of members who have submitted medical claims that are covered under the benefits booklet.  *Id.*

55.     Members' "contributions" (i.e. premiums) are not refundable.  Although the member "contributions" are called "voluntary," if members fail to make the premium payment, they are not entitled to coverage for medical expenses.  *Id.*, p. 18.

56.     Defendants' programs are contracts whereby Defendants undertake to indemnify a member upon the occurrence of determinable contingencies and therefore constitute "insurance" as defined by Colorado law. *See* §10-1-102(12) C.R.S.  The Colorado Division of Insurance has so concluded.  ***Appendices E and F.***  Defendants are required to comply with Colorado and federal law governing insurers.

### *The Health Insurance Plans Defendants Create, Market, Sell, and Administer Are Illegal*

57.     Defendants do not have a certificate of authority as required by § 10-3-105 C.R.S. from the State of Colorado to issue insurance within this state and are not authorized insurers under Colorado law.  Defendants have issued illegal and unauthorized insurance products to Plaintiff and other members of the class.

58.     Defendants' plans are not ACA-compliant because they do not meet the minimum coverage requirements under the ACA's Essential Health Benefits.  For example, the policies impose a 24-month waiting period on coverage, which is illegal under the ACA.  *See* 42 U.S.C. §300gg-3. *See also,* § 10-16-118 C.R.S.

59.     The plans purport to require binding arbitration, which is illegal in Colorado.  § 10-3-1116(3) C.R.S.

60.     The benefits booklet, which has never been reviewed or approved, contains inconsistent and contradictory coverage terms and conditions.  For example, on one hand it suggests that Defendants are required to administer benefits in

accordance with the terms of the benefits booklet, while other provisions suggest that Defendants are not required to pay any benefits whatsoever.  The benefits booklet also states the plan is an "opportunity for members to care for one another in a time of need, [and] to present their medical needs to other members," but in fact Defendants – like an insurance carrier -  make all coverage decisions without ever presenting one member's needs to other members.

### Multiple States Have Found that Aliera and Trinity Are Illegally Marketing, Selling and Administering Insurance Products That Do Not Qualify as HCSMs

61.      On August 12, 2019, the State of Colorado Division of Insurance found Defendants were selling insurance products, and issued cease and desist orders ordering them to immediately stop selling the unauthorized insurance in the State of Colorado.  **Appendices E and F**.

62.      The State of Texas has successfully enjoined Aliera from enrolling any new members in Texas.  As the Texas Attorney General argued on July 11, 2019 in *State of Texas v. Aliera Healthcare, Inc.*, Travis County Cause No. D-1-GN-19-003388:

> The Defendant Aliera Healthcare, Inc., is engaged in the business of insurance in this State without a license, in violation of Tex. Ins. Code § 101.101.  …  In meetings with State regulators, Aliera representatives have asserted that Aliera is exempt from state regulation because it merely administers a "health care sharing ministry." ***Aliera is no ministry, however; it is a multi-million dollar for profit business that admittedly siphons off over 70% of every dollar collected from its members to "administrative costs."***

*Appendix G*, pp. 1-2 (emphasis added).

63.      The Washington Insurance Commissioner, Mike Kriedler, conducted a formal investigation in response to consumer complaints and concluded that Trinity did not meet the statutory definition of an HCSM under Washington and federal law.  *See Appendix H*.  Commissioner Kriedler further concluded that Aliera acted as an

unauthorized health care service contractor without being registered and was doing business as an unlicensed discount plan organization, and that Aliera's advertisements on behalf of Trinity were deceptive and had the capacity to mislead or deceive consumers into believing that they purchased insurance.  On May 13, 2019, Commissioner Kriedler issued "Orders to Cease and Desist" to Aliera and Trinity.  *See id.* and *Appendix I.*  On December 30, 2019, Trinity entered into a consent order that prohibited it from enrolling any new Washington residents, and was fined $150,000.  *Appendix J.*

64.     The New Hampshire Insurance Department entered a Cease and Desist Order against Aliera and Trinity on October 30, 2019, ordering them to stop selling or renewing illegal health insurance in New Hampshire.  *Appendix K.*

65.     Regulators in Georgia have also issued warnings.  *See e.g. Appendix L.*

### Plaintiff Was Sold Sham Products by Aliera/Trinity That Did Not Provide the Benefits Promised

66.     Plaintiff Larson enrolled in AlieraCare in July of 2018, while Aliera partnered with Unity.

67.     Her plan through Aliera/Unity was subsequently transferred to Aliera/Trinity.

68.     She made a payment to Aliera for $452.44 and to Unity for $25 in July 2018, and made monthly premium payments of $352.44 per month each month from August through December 2018.

69.     Ms. Larson received what she believed was an insurance card from Aliera/Trinity.  *See Appendix D.*  The insurance card falsely stated that she was a member "of a Health Care Sharing Ministry *recognized pursuant to 26 U.S.C.*

*§ 5000A(d)(2)(B)*" even though neither Trinity nor Aliera was ever certified or "recognized" by any government agency as an HCSM.

70.     The AlieraCare Trinity plan sold to Ms. Larson was insurance under Colorado law.  However, it failed to comply with Colorado and federal law in its provisions of benefits.

71.     Ms. Larson was assaulted on August 3, 2018, while covered by Defendants' Plan.  She was attacked and knocked unconscious.  She was taken to the hospital with serious injuries, including a skull fracture, cervical spine fracture, and intercranial bleeding. When she submitted her bill for payment by Defendants, her claim was denied.  When she appealed, Defendants decided to cover a different denied claim as a result of the appeal.  *Appendix M.*

72.     Ms. Larson appealed a second time.  Defendants then took the position that Ms. Larson's injuries were "self-inflicted" and excluded under her policy. *Appendix  N.*

73.     Ms. Larson continues to be pursued for these debts.

## VI.  CLAIMS FOR RELIEF

### A.     Illegal Contract

74.     Plaintiffs reallege all prior allegations as though fully stated herein.

75.     Defendants sold Plaintiff and all members of the proposed class unauthorized and illegal health insurance plans in violation of Colorado law:

    a.  The plans were insurance, but were sold without authorization in
        Colorado.

    b.  The plans failed to provide the essential health benefits required under the
        ACA, and Colorado law.

c.   The plans exclude coverage for pre-existing conditions and impose waiting periods.

d.   The Member Guide contains inconsistent and contradictory coverage terms and conditions that allow Defendants to arbitrarily deny coverage.

e.   The plans included a binding arbitration provision illegal under Colorado law. §10-3-1116 C.R.S.

76.   Plaintiff and all members of the proposed class are entitled to either (a) rescission of the illegal contract(s) and return of the insurance premiums paid; or (b) reformation of the illegal contract(s) to comply with the mandatory minimum benefits and coverage required under Colorado and federal law.

### B.   Violation of the Colorado Consumer Protection Act

77.   Plaintiffs reallege all prior allegations as though fully stated herein.

78.   Defendants' creation, marketing, sale and administration of unauthorized health insurance plan(s) to class members constitutes unfair and/or deceptive acts under the Colorado Consumer Protection Act ("CCPA").  Under the CCPA, Plaintiffs and members of the proposed class are entitled to damages, injunctive relief, statutory treble damages (up to $25,000 for each violation) and attorneys' fees and costs.

79.   Defendants have committed the following unfair acts or practices that are deceptive or misleading or have the capacity to be deceptive or misleading. These acts or practices include, but are not limited to, the following:

(a)   Defendants have advertised and represented that Trinity is a "Health Care Sharing Ministry recognized pursuant to 26 U.S.C. § 5000A(d)(2)(B)." This is false and/or misleading for at least the following reasons:

(i)   Trinity has not "been in existence at all times since December 31, 1999, and medical expenses of its members have been shared

– 19 –

continuously and without interruption since at least December 31, 1999." 26 U.S.C. § 5000A(d)(2)(B)(IV).  It therefore is not, as a matter of law, a HCSM.

       (ii)     Trinity was never "certified" or "recognized" by any governmental agency as an HCSM.

       (iii)    Trinity is not now, and was never on, the list of recognized HCSMs created by the Department of Health and Human Services.

       (iv)    The Department of the Treasury/IRS has never recognized, approved or disapproved entities as HCSMs under 26 U.S.C. § 5000A.  It has no process for doing so.

       (v)     Trinity does not restrict membership to only those members that share its beliefs as set forth in its bylaws as required by 26 U.S.C. § 5000A.  Rather, individuals who do not share Trinity's Protestant statement are allowed membership.

       (b)    Defendants have consistently and repeatedly represented that AleriaCare/Trinity and related products are "not insurance."  This representation appears in the benefits book, in advertising material, in training material and on its webpages.  This representation, however, is false and/or misleading. Under Colorado law, Defendants are offering insurance to members of the public.

       (c)    Defendants' insurance products include provisions, conditions, exclusions and restrictions that are illegal under Colorado law.  These include, but are not limited to, the following:

       (i)     Defendants purport to require members to submit disputes to arbitration even though Colorado law prohibits binding arbitration agreements in insurance contracts.

       (ii)    Defendants purport to exclude certain pre-existing conditions even though such exclusions are illegal under Colorado and federal law.

(iii)     Defendants purport to impose waiting periods even though such waiting periods are illegal under Colorado and federal law.

(iv)     Defendants fail to provide coverage for treatments and conditions that are mandated benefits under Colorado and federal law.

(v)     Defendants purport to exclude or limit treatments and conditions that are required to be covered under Colorado and federal law.

(vi)     Defendants impose lifetime caps and limits on coverage that are illegal under Colorado and federal law.

(vii)     The benefits booklet, which has never been reviewed or approved by the Colorado Department of Insurance, contains inconsistent and contradictory coverage terms and conditions.  Defendants do not hold a Certificate of Authority to issue insurance in the State of Colorado as required by 10-2-105 C.R.S., yet they market and sell insurance plans to class members.

(d)     Colorado law requires that an insurer maintain certain loss ratios. Defendants' loss ratios do not comply with these law and regulations.  Defendants, in fact, do not maintain enough reserves to protect its members from insolvency.  For-profit Aliera, in fact, takes most of the member premiums as fees.

(e)     Given that the vast majority of the premiums paid are taken by Aliera as fees, the Defendants' program is not a true ministry, but a profit-making enterprise designed to enrich the owners of Aliera.  Consumers were led to believe that their premiums would primarily be used to pay claims of other members.  In fact, most of the contributions were used to pay Aliera and its owners.

(f)     Defendants' advertisements and solicitations of customers for its products is misleading and/or deceptive.  Specifically, the advertisements and solicitation deceive or mislead, or have the capacity to deceive or mislead, members of

the class that they were purchasing an authorized health insurance product.  The look and feel of the advertising material suggest that the plan is a health insurance product. Defendants use such things as insurance cards, PPO networks, plan booklets, plan levels, health insurance lexicon (such as "healthcare") to create the impression that they are offering real health insurance benefits.

(g)     Online training videos, available to the public and brokers, downplay the ministry aspects of the program and suggest that the program is a form of legitimate healthcare insurance when it is not.

(h)     Defendants misrepresent the program as a "sharing" program that provides members with a role in determining whether claims should be paid, when in fact all coverage decisions were made arbitrarily by Aliera, and in Aliera's best interest.

(i)     Defendants misrepresent that Trinity, because it is a nonprofit with "nothing to gain or lose financially by determining if a need is eligible or not" is the entity to whom members delegated coverage decision authority. In reality, all coverage decisions were made by Aliera, a for-profit that made substantial profits from not paying health care claims.

80.     The deceptive or unfair acts or practices of Defendants occurred in trade or commerce; specifically, the marketing, sale and administration of insurance products to Colorado residents.

81.     The public interest element of the CCPA exists here because the business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters.  The sale of healthcare plans to the public also directly affects the public interest.

82.     Plaintiffs and the class have been injured as a direct result of Defendants'
conduct.  They were sold unregulated insurance products that are illegal under
Colorado law.  The products do not have enough loss ratios to provide protection. The
products provide less coverage than permitted under law, thereby rendering the
policies less valuable than products that do comply with the law.  Plaintiff and the class
have been denied care, or limited in care, due to illegal caps, exclusions and limitations.
Plaintiff and the class have foregone coverage under the ACA, including subsidized
benefit packages that would provide legal, comprehensive, and secure health insurance
coverage.  Defendants' polices were overpriced for the coverage they purported to
provide given that over 80% of the contributions were paid in fees to Aliera, causing
Plaintiff and the class to overpay for the illegal and unregulated policies.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

(a)     Certify that this action may proceed as a class action as defined in
¶16 above;

(b)     Designate Ms. Larson as class representative and designate
Michael David Myers, Myers & Company, PLLC and Victoria Lovato, Michael Best &
Friedrich, as class counsel;

(c)     Declare that Defendants' unauthorized health insurance plans were
and are illegal contracts;

(d)     Declare that Defendants' actions as alleged herein towards the
members of the class violate the Colorado Consumer Protection Act;

(e)     Order Defendants to (i) rescind the unauthorized health insurance
plans and refund all premiums improperly received from members of the proposed
class, including interest; or, at the option of any class member (ii) reform the

unauthorized health insurance plans to comply with the minimum mandatory benefits required under the relevant state insurance code and federal law, permit class members to submit claims for medical services, costs and other expenses that would have been covered;

(f)     Order payment of all other expenses causally related to Defendants' unfair and/or deceptive acts;

(g)     Order an award of treble damages under the CCPA;

(h)     Order payment of reasonable attorneys' fees; and

(i)     Grant such other relief as this Court may deem just, equitable and proper.

DATED:  January 13, 2020.

_s/ Victoria E. Lovato_
Victoria E. Lovato (CO Bar # 31700)
MICHAEL BEST & FRIEDRICH LLP
1776 Lincoln Street, Suite 1100
Denver, CO  80203
Tel. (720) 240-9515
Email:  velovato@michaelbest.com


_s/ Michael David Myers_
Michael David Myers
MYERS & COMPANY PLLC
1530 Eastlake Avenue East
Seattle, WA 98102
Tel. (206) 398-1188
Email:  mmyers@myers-company.com

Attorneys for Plaintiffs